**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **MINISTER NORMAN V WHITESIDE,** | |
| **Plaintiff,** | **Case No. 2:25-cv-1187** |
| **v.** | **JUDGE DOUGLAS R. COLE** **Magistrate Judge Jolson** |
| **SHERIFF DALLAS BALDWIN, et al.,** | |
| **Defendants.** | |

**OPINION AND ORDER**

Plaintiff Minister Norman V. Whiteside was held in the Franklin and Muskingum County jails as a pretrial detainee. (Compl., Doc. 2, #20). The two Defendants, Sheriffs Baldwin and Lutz, are the government officials responsible for operations at each jail. (*Id.*). Whiteside, citing conditions he says are so poor as to be unconstitutional, seeks compensation for his detainment, as well as an order preventing his return. (*Id.* at #23). Each Defendant separately moves to dismiss, arguing that Whiteside fails to state a claim. (*See* Docs. 3, 4). While those motions were pending, Whiteside filed a Motion to Amend the Complaint (Doc. 11) seeking to add "previously unidentified John Doe Defendants who were employees and/or agents working at the jail." (*Id.* at #133 (emphasis omitted)). For the reasons below, the Court **GRANTS** Defendants' respective motions to dismiss. Further, as it would not save his claims, the Court **DENIES** Whiteside's current Motion to Amend the Complaint (Doc. 11) as futile. That said, the Court provides Whiteside twenty-one

days in which to seek leave to file an amended complaint addressing the deficiencies outlined below.

## BACKGROUND[1]

Police arrested Whiteside on February 28, 2025, and took him to Franklin County Jail.[2] (Doc. 2, #20). There, despite being "72 years of age with [a] heart condition, diabetes[,] and hypertension with benign paroxysmal positional vertigo," he was housed in poor conditions. (*Id.*). At the jail, Whiteside slept on the concrete floor (while the lower bunks were taken by those with no medical needs), "was denied a diet consistent with his having diabetes," and "was consistently exposed to events such as inmates walking other inmates who were on all fours like they were dogs." (*Id.*). Whiteside argues that this failure to ensure that he "was in conditions … consistent with his medical needs" fell short of "provid[ing] constitutional standards of care." (*Id.*).

Six days later, Whiteside was transferred to Muskingum County Jail, where things apparently got even worse. (*Id.*). There, he was provided underwear with holes,

[1] Because this matter is before the Court on Defendants' motions to dismiss, the Court must accept the well-pleaded allegations in the Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). So while the Court relies on the complaint's allegations to recount the case's background, it reminds the reader that they are just that—allegations.

[2] Even though he seeks declaratory and injunctive relief, Whiteside does not state his current circumstances—i.e., whether he remains in pretrial detention. (*See* Doc. 2, #23). Baldwin asserts that at the time of the filing of his motion to dismiss on October 16, 2025, Whiteside remains on a surety bond while his charges remain pending. (Doc. 3, #27). Based on this, Defendants argue that his requests for equitable relief are moot. (*Id.* at #41–42). While this is likely the case, the Court declines to rule on the issue as the Court's Opinion terminates the case in its entirety.

a mattress with no stuffing, and stained bedding. (*Id.* #20–21). Once again, all the beds were taken, and so Whiteside "was made to sleep on the floor inside a 'boat'[3] where he remained for 62 days." (*Id.* at #21). The sink required "jerry-rigg[ing]" to work and lacked hot water, while the shower had "little black worms" at its base. (*Id.*). Like the sink, the shower required makeshift repairs to work properly—it was operated by inserting a pencil in the nozzle to stop the flow, which was then removed for Whiteside to shower. (*Id.*).

Also, while he remained detained in those conditions, Whiteside was not provided with the needed diet for his health issues and denied certain medications because the jail's "medical staff did not agree with why [Whiteside's] primary care physician prescribed the medicines." (*Id.*). Even worse, Whiteside alleges he "was made to drink contaminated water that resulted in" a visit to the emergency room. (*Id.*). He was also provided recreation only twice in his sixty-two days of incarceration. (*Id.* at #22). On top of all that, Muskingum County Jail had "a rodent and insect problem." (*Id.*).

At one point, when an attorney came to visit Whiteside to see about arranging bond, the jail staff made that attorney leave because he was not listed as Whiteside's counsel of record, despite there being no jail policy requiring a visiting attorney to be counsel of record. (*Id.* at #21). And when Whiteside requested a computer, typewriter, or even an ink pen, to access the courts, he was given a "four-inch golf pencil" and

[3] "A boat is a plastic liner with a mat placed in it that inmates are given to sleep in lieu of a bed when there are not enough bunks available." *Eaton v. Plasse*, No. 2:22-cv-379, 2025 WL 786762, at *2 (S.D. Ind. Mar. 12, 2025).

"told that the pencil was his access to the courts." (*Id.*). When he requested legal books, he was given a 2019 edition of the Ohio Revised Code with pages missing. (*Id.* at #22). When he asked to get documents notarized, the notary refused, stating that she would only notarize documents that an attorney drafted. (*Id.* at #21–22). Finally, Whiteside wrote grievances that he believes were never processed "because prisoners/detainees at [Muskingum County] Jail are given no type of receipt when they attempt to lodge grievances." (*Id.* at #22). Finally, Whiteside says that the poor jail conditions were "intentionally maintained or used to pressure [him] and other detainees into pleading guilty," although he fails to identify any facts supporting that allegation. (*Id.*).

Based on the above "horrible and unsafe conditions," Whiteside brings claims against Sheriff Baldwin, who he says is responsible for the operation of Franklin County Jail, and Sheriff Lutz, who he says is responsible for the operation of Muskingum County Jail. (*Id.* at #20, 22). But the complaint is light on details regarding exactly what role the sheriffs play in jail operations. On that front, all Whiteside states is that each sheriff is responsible for "training and supervising jail staff, and for maintaining lawful conditions of confinement" of his respective jail. (*Id.* at #20).

Whiteside originally brought suit in the Franklin County Court of Common Pleas against Defendants in their individual and official capacities. (*Id.* at #19). He asserted three counts: (1) a cruel and unusual punishment/due process Eighth and Fourteenth Amendment claim, which he says is based on the attempted coercion of

detainees to plead guilty; (2) a right to a fair trial/due process Sixth and Fourteenth Amendment claim, which he says is based on the fact that if Whiteside is eventually found guilty, he will be forced to return to the unconstitutional confinement conditions; and (3) a conspiracy to violate civil rights 42 U.S.C. § 1985 claim because Muskingum County Judges and prosecutors are aware of the conditions described and conspiring with Defendants to deprive Whiteside of his constitutional rights. (*Id.* at #22–23).

Lutz, with the consent of Baldwin, removed the matter, citing federal question jurisdiction. (Doc. 1, #1–2). Less than a week later, Baldwin and Lutz each filed motions to dismiss. (Docs. 3, 4). Whiteside filed a consolidated response, (Doc. 8), and Defendants each replied, (Doc. 9, 10), making those motions ripe. While the motions were pending, Whiteside filed a Motion for Leave to Amend the Complaint, seeking to add "previously unidentified John Doe Defendants who were employees and/or agents working at the jail" under Baldwin and Lutz. (Doc. 11, #133 (emphasis omitted)). He argues that other personnel who directly participated in the alleged constitutional violations also belong in the suit, and that their identities, while unknown, can be ascertained through discovery. (*Id.* at #134). Defendants filed a joint response, (Doc. 12), but Whiteside has declined to reply, so that motion is ripe as well.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir.

2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In assessing plausibility, the Court "construe[s] the complaint in the light most favorable to the plaintiff." *Bassett*, 528 F.3d at 430 (quotation omitted).

Regarding the motion to amend, "court[s] should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). But "[t]he grant or denial of a request to amend a complaint is left to the broad discretion of the trial court." *Holmes v. Wilson*, No. 2:08-cv-602, 2009 WL 10679014, at *1 (S.D. Ohio Jan. 14, 2009) (citing *Gen. Elec. Co. v. Sargent & Lundy,* 916 F.2d 1119, 1130 (6th Cir. 1990)). "[C]ourts may deny leave to amend when the amendment would be futile." *Dubuc v. Green Oak Twp.*, 312 F.3d 736, 752 (6th Cir. 2002). The touchstone for assessing futility is whether the proposed amendment can survive a Rule 12(b)(6) motion to dismiss. *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).

## LAW AND ANALYSIS

Below, the Court addresses multiple issues, finding against Whiteside on each. First, (after discussing Whiteside's mislabeling of his claims) the Court finds that Whiteside fails to plead the personal involvement of either Defendant in the relevant events, which is fatal to his individual-capacity § 1983 claims. Next, and independently fatal, the Court finds that the conditions Whiteside describes do not plausibly state a constitutional violation. Then, the Court finds that Whiteside fails

to point to a policy or custom that violated his rights, dooming his official-capacity claims. After that, the Court finds that Whiteside's § 1985 conspiracy claim fails because it fails to plead a plausible conspiracy. Finally, the Court turns to Whiteside's motion to amend and finds that it is futile.

### A. Whiteside Fails to Plausibly Allege a 42 U.S.C. § 1983 Claim.

This case centers on Whiteside's allegations that Defendants, two county sheriffs administering jails, violated his constitutional rights. He attempts to bring both individual and official-capacity § 1983 claims against those sheriffs to vindicate those rights. But those attempts fall short. For one, the constitutional provisions he cites are largely inapplicable to his allegations. His individual-capacity claims also fail for another threshold issue; he fails to plausibly allege any direct involvement by either sheriff in the alleged wrongdoing. Finally, all his claims fail for yet another reason: as he alleges them, the conditions of the jails are not constitutional violations. The Court takes each in turn.

1. Start with the claims themselves. Whiteside alleges violations of the Eight Amendment's prohibition on cruel and unusual punishment and the Sixth Amendment's right to a fair trial.[4] (Doc. 2, #22–23). In both those counts, Whiteside also cites the Fourteenth Amendment's due process clause but does not indicate

---

[4] Whiteside also references, in passing, a violation of his "First Amendment Right of Access to the Courts" as one of several "horrible and unsafe conditions." (Doc. 2, #22). This allegation does not appear in any of the three enumerated counts and is therefore not independently before the Court. But even construed liberally as a standalone claim, it would fail: a First Amendment access-to-courts claim requires a plaintiff to allege actual hinderance in his pursuit of a *specific*, non-frivolous legal claim. *Lewis v. Casey*, 518 U.S. 343, 351–53 (1996). Whiteside points to no such pursued legal claim here.

whether he intends it simply as the mechanism incorporating the Sixth and Eighth Amendments against the states or as an independent basis for relief.

That matters because the Sixth and Eighth Amendments, as incorporated against the states through the Fourteenth Amendment, do not supply a viable cause of action in this case. As a pretrial detainee, the Eighth Amendment does not apply to Whiteside at all. *See Griffith v. Franklin Cnty.*, 975 F.3d 554, 567 (6th Cir. 2020) (explaining that while the same "framework" applies, prisoners may bring Eighth Amendment claims and pretrial detainees may bring Fourteenth Amendment claims); *Beck v. Hamblen Cnty.*, 969 F.3d 592, 601 (6th Cir. 2020) (same). So, the Eighth Amendment is out.

Whiteside's Sixth Amendment claim fares no better. The Sixth Amendment guarantees rights that are intrinsically trial-related—the right to a speedy and public trial, an impartial jury, confrontation of witnesses, compulsory process, and the assistance of counsel. U.S. Const. amend. VI. Whiteside's Sixth Amendment count, though, is expressly premised on his conditions of confinement. (*See* Doc. 2, #23). Indeed, Count II seems to be based only on the fear that "[i]n the event that Plaintiff is somehow found guilty of the crimes charged in Muskingum County, he will be forced to return to the unconstitutional conditions described [in the complaint]." (*Id.*). That has nothing to do with any of his trial rights, and in any event, is too speculative a harm, *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997) (discussing ripeness), so the Sixth Amendment is out.[5]

---

[5] To the extent Whiteside intends to raise a Sixth Amendment access-to-counsel claim based on the turned-away attorney visit, that allegation is directed at unnamed staff at Muskingum

That means the only possible route for a § 1983 claim would be a direct claim under the Fourteenth Amendment. Unfortunately, it is simply not clear what sort of Fourteenth Amendment claim he aims to bring, if he aims to bring one at all. That alone might warrant dismissal of the first two counts. Still, Whiteside does at least reference the Fourteenth Amendment's due process clause, which *could* provide him with a route to state a conditions-of-confinement claim. (Doc. 2, #22–23). And, after all, his allegations are focused on those conditions. So, the Court, while strongly advising Whiteside to employ more artful pleading in the future, will treat his complaint as attempting to allege a conditions-of-confinement Fourteenth Amendment due process claim under § 1983.

2. Even so, Whiteside's individual-capacity claims do not get far. "Because vicarious liability is inapplicable to … § 1983 suits, [Whiteside] must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added). He "must therefore show how each defendant 'directly participated in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself.'" *Gardner v. Evans*, 920 F.3d 1038, 1051 (6th Cir. 2019) (quoting *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013)). In other words, Whiteside must not only plausibly plead constitutional

---

County Jail and establishes no personal involvement by either Defendant. (*See* Doc. 2, #21). It therefore cannot support a claim against Baldwin or Lutz on any theory.

violations (which the Court finds he fails to do below), but also that each sheriff played some direct role in those violations. Whiteside pleads no such active role.

Indeed, the complaint only mentions Lutz *once*, stating that he "is responsible for the operation of [Muskingum County] Jail, for training and supervising jail staff, and for maintaining lawful conditions of confinement." (Doc. 2, #20). That is not enough for the Court to infer that Lutz was even aware of any potential constitutional violations, let alone that he played some active role in perpetrating them. As to Baldwin, Whiteside alleges the exact same thing as to the operation of Franklin County Jail, and also that "Baldwin was supposed to ensure that Plaintiff was in conditions that were consistent with his medical needs, and he failed to provide constitutional standards of care in this regard." (*Id.*). That is nothing more than a legal conclusion couched as a fact, the exact type of conclusory statement "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681 (citing *Twombly*, 550 U.S. at 554–55). In short, Whiteside basically alleges that the sheriffs are responsible for any constitutional harm he suffered at the respective jails simply because, based on their status as supervisors at those facilities, they could have prevented those harms. That does not state a viable § 1983 claim. *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) ("Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." (quoting *Bass v. Robinson,* 167 F.3d 1041, 1048 (6th Cir.1999))).

3. In analyzing the alleged constitutional violations themselves, the Court deals with Whiteside's most full-throated allegation first—that not only were the

conditions of the two jails so poor as to violate his rights, but that Defendants *intentionally* maintained them as such to induce guilty pleas. (Doc. 2, #22). While such a scheme could certainly give rise to a due process claim under § 1983,[6] Whiteside pleads no facts in support of that assertion. All the complaint states is that the "overall conditions" at the jails were "designed to induce Plaintiff and other detainees into coercive plea agreements," and nothing more. *(Id.* at #22). Without pointing to any circumstantial or direct evidence supporting the alleged link between the conditions and the allegedly intended results, though—e.g., statements from officials or personnel—that is again precisely the sort of conclusory allegation *Twombly* and *Iqbal* instruct courts to disregard.

But that does not end the inquiry. Pretrial detainment conditions could still very well be so poor as to violate Whiteside's due process rights *without* any illicit purpose.

In this Circuit, to state such a conditions-of-confinement claim, Whiteside must demonstrate two prongs: (1) that he was detained under conditions posing an objectively "substantial risk of serious harm," and (2) that the individual defendants responded to that risk in a way that was both deliberate and "recklessly" indifferent—or, more simply, the defendants intentionally ignored a serious risk to Whiteside. *Lawler as next friend of Lawler v. Hardeman Cnty.*, 93 F.4th 919, 926–27 (6th Cir.

---

[6] While an involuntary guilty plea certainly interferes with a criminal defendant's trial rights, the vehicle for challenging the voluntariness of such a plea in connection with a state court proceeding is nonetheless the Fourteenth Amendment's due process clause, not the Sixth Amendment (as incorporated by the Fourteenth Amendment). *See, e.g., Stano v. Dugger,* 921 F.2d 1125, 1142 (11th Cir. 1991).

2024) (describing the Fourteenth Amendment standard for pretrial detainees and its departure from the Eighth Amendment's subjective deliberate-indifference test); *Brawner v. Scott Cnty.*, 14 F.4th 585, 596–97 (6th Cir. 2021) (same). So at the pleading stage, he would need to present factual allegations plausibly alleging he could meet that standard. The way the Court sees it, Whiteside's complaint could be construed as pressing two separate, but related, theories in an attempt to do so. On one hand, he cites his underlying medical conditions and the jails' specific failures to accommodate them, and on the other, he makes allegations about the general conditions of confinement. (Doc. 2, #20–22).

A "substantial risk of serious harm" requires somewhat different showings in each of those contexts. For example, with regard to medical harm, he must show an objectively serious medical need posing a risk of harm. *Grote v. Kenton Cnty*, 85 F.4th 397, 405 (6th Cir. 2023). Outside the specific medical context, demonstrating that substantial risk is a bit more nebulous. Many courts, drawing from the Eighth Amendment context, have looked to see if the jail conditions constituted "extreme deprivations" that deny the detainees "the minimal civilized measure of life's necessities." *Dooley v. Knox Cnty. Sheriff's Dep't*, No. 3:23-cv-266, 2024 WL 5046718, at *9 (E.D. Tenn. Dec. 9, 2024) (quoting *Hudson v. McMillan*, 503 U.S. 1, 8–9 (1992)). Ultimately, outside of the contaminated water and his resulting hospitalization, Whiteside fails to plead a substantial harm under either theory. And as discussed above, he alleges no direct involvement by either Defendant, meaning that, even as

to the contaminated-water incident, Whiteside cannot show the second required prong—that Lutz was deliberately indifferent to that potential harm.

Start with Franklin County Jail, which Baldwin oversaw, and where Whiteside was detained for six days. Whiteside says that he is seventy-two years old with a "heart condition, diabetes[,] and hypertension with benign paroxysmal positional vertigo." (Doc. 2, #20). Yet, during his six days there, he was made to sleep on the floor because the lower bunks were taken, denied a diet consistent with his diabetes, and was "exposed to events such as inmates walking other inmates who were on all fours like they were dogs." (*Id.*). The problem is, while Whiteside lists his various health problems alongside some poor (and admittedly in some ways odd) jail conditions, he does not state what *risk of harm* the combination of the two created. For example, from his complaint, it is unclear what link, if any, a heart condition might have with sleeping on the floor. Sure, he alleges that he "was denied a diet consistent with his having diabetes," but again, there he makes no mention of what health risk that caused, whether he suffered any harm, or even if anyone at the jail was aware that he has diabetes. (*Id.* at #20). Separate from his health conditions, his allegations are insufficient to plead an extreme deprivation of life's necessities. And as discussed above, Whiteside pleads no personal actions by Baldwin (or anyone else), meaning he necessarily fails on the second prong.

Turn to Muskingum County Jail, which Lutz oversaw. Whiteside was detained there for sixty-two days—a substantially longer stay than at Franklin County—and his allegations are more numerous. (*Id.* at #21–22). He alleges that he received

underwear with holes and a mattress without stuffing, was made to sleep in a "boat" on the floor due to overcrowding, was denied a diet consistent with his medical conditions, had medications withheld because staff disagreed with his physician's judgment, was given a jerry-rigged sink and shower and no hot water, was forced to drink contaminated water that sent him to the emergency room, encountered a rodent and insect problem, was given recreation only twice in sixty-two days, and faced opposition in his legal efforts. (*Id.*).

The Court takes these in turn. Once again, Whiteside alleges denial of a diet consistent with his medical conditions, and here he adds that staff withheld certain medications because they disagreed with his physician. (*Id.* at #21). These allegations are more developed than their counterparts, but they still suffer from the same defect: Whiteside does not allege what health risk the dietary denial created over the sixty-two-day period, whether he suffered any adverse consequences from the medication denial, or any facts suggesting why staff's disagreement with his doctor might constitute deliberate indifference. Without facts connecting these deprivations to a serious medical risk or a deliberate response by any official, they do not plausibly satisfy the objective or subjective prong.

Holes in underwear and a deficient mattress are not constitutional violations. *Barnes v. Holder*, No. 1:14-cv-3, 2014 WL 1478440, at *3 (E.D. Mo. Apr. 15, 2014) ("Holes in clothing or bedding do not … show either an excessive risk to health or safety or a denial of a civilized measure of life's necessities."). Sleeping in a "boat"—a plastic liner with a mat used when bunks are unavailable—fares no better. Courts

have generally held that sleeping in a boat, while unpleasant, does not deprive a detainee of life's necessities or expose him to a substantial risk of serious harm. *See Eaton*, 2025 WL 786762, at *3 (collecting cases). The rodent and insect problem fails for a similar reason: "[t]he occasional presence of a rodent [or insects] is insufficient to establish the objective component … which requires that a deprivation be sufficiently serious." *Tucker v. Rose*, 955 F. Supp. 810, 816 (N.D. Ohio 1997). Nor does a temporary lack of recreation constitute a serious deprivation. *See Brown v. Kelly*, No. 4:12-cv-1356, 2012 WL 5877424, at *3 (N.D. Ohio Nov. 20, 2012) ("Occasional deprivation of recreation for a limited time is insufficient to suggest the type of extreme deprivations which are necessary for a[] … conditions of confinement claim.") (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). And Whiteside does not allege any risk of injury or illness resulting from any of those conditions.

Whiteside's attorney access, notary access, court access, and grievance procedure allegations likewise fail to state a constitutional claim. While perhaps relevant to other constitutional claims that Whiteside does not bring, *see supra* notes 4 and 5, none of these allegations suggest a "substantial risk of serious harm" to his health in any way.

The contaminated water allegation, though, is different. Whiteside alleges he "was made to drink contaminated water that resulted in [him] having to be taken to the emergency room." (Doc. 2, #21). Unlike the conditions above, water so contaminated as to result in an emergency room visit *does* plausibly pose a substantial risk of serious harm and thus satisfies the objective prong, at least for

pleading purposes. Indeed, Lutz appears to concede as much. (Doc. 4, #51). But the claim still fails on the subjective prong as applied to Lutz. Whiteside pleads no facts suggesting that Lutz (or indeed, anyone) *knew* the water was contaminated or that he was in any way responsible for it. Thus, the Court cannot infer that Lutz was *deliberately* indifferent towards that risk.

And there is one last point worth mentioning. As municipal employees, Defendants also invoke a qualified immunity defense. "In order to overcome a defendant's qualified immunity defense at the motion to dismiss stage, a plaintiff must plausibly allege facts showing '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). As discussed, Whiteside has not plausibly alleged a constitutional violation, let alone one that is clearly established in the case law. So, qualified immunity shields Defendants from Whiteside's claims as well.

4. Whiteside also fails to allege viable claims against the sheriffs in their official capacities. Official-capacity claims function as suits against the entities administering the two jails—Franklin County and Muskingum County. *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 354 (6th Cir. 2013) (citation omitted) ("[A]n official-capacity claim is merely another name for a claim against the municipality."). Such claims are governed by *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Under *Monell*, Whiteside must allege that his "constitutional

rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of plaintiff's rights." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254–55 (6th Cir. 2010) (quoting *Powers v. Hamilton Cnty. Pub. Defender Comm'n,* 501 F.3d 592, 606–07 (6th Cir. 2007)). But "where there has been no showing of individual constitutional violations on the part of the officers involved, there can be no municipal liability." *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019) (citation omitted).

Whiteside's *Monell* claims largely fail at that first step, as discussed above, he has not alleged a violation of any of his constitutional rights, except, potentially, the contaminated water. But that allegation is not enough. That is because Whiteside fails to connect the contaminated water with any "policy or custom" as *Monell* requires. So, the Court dismisses Whiteside's official-capacity claims as well.[7]

## B. Whiteside Fails to Allege the Necessary "Conspiracy" for a 42 U.S.C. § 1985 Conspiracy Claim.

Whiteside's conspiracy claim (Count III) fares no better. To state a claim under 42 U.S.C. § 1985,[8] a plaintiff must allege a conspiracy to deprive him of his civil rights, meaning that (1) a "single plan" existed, (2) the defendants "shared a conspiratorial objective to deprive" plaintiff of his constitutional or federal statutory rights, and (3) "an overt act was committed in furtherance of the conspiracy that

[7] While Whiteside may be intending to bring an official-capacity 42 U.S.C. § 1985 conspiracy claim as well (he does not specify), that claim would fail for the same reasons as the conspiracy claim against Baldwin and Lutz in their individual capacities.

[8] While Whiteside fails to state which subsection of § 1985 he brings a claim under, it ultimately does not matter, as all three require there to be an actual conspiracy, which he has not plausibly alleged.

caused the injury" to the plaintiff. *Jackson v. City of Cleveland*, 925 F.3d 793, 817 (6th Cir. 2019). Whiteside's conspiracy allegations are wholly conclusory—he asserts only that Muskingum County judges and prosecutors are "aware of the conditions" and "conspiring with Defendants to deprive Plaintiff of constitutional rights through coordinated actions." (Doc. 2, #23). That is a naked legal conclusion, unsupported by any facts suggesting a single plan, a shared conspiratorial objective, or any overt act in furtherance of an agreement. *See Iqbal*, 556 U.S. at 681 (citing *Twombly*, 550 U.S. at 554–55). Count III is dismissed.

### C. The Court Denies Whiteside's Motion for Leave to Amend His Complaint Because the Proposed Amended Complaint Is Futile.

Finally, Whiteside moves under Federal Rule of Civil Procedure 15(a)(2) for leave to file an amended complaint adding up to one hundred unnamed John/Jane Doe defendants—"unknown corrections officers, supervisors, and/or jail personnel [that] directly participated in" creating the unconstitutional conditions. (Doc. 11, #133–34; Doc. 11-1, #136 (proposed amended complaint)). Although Rule 15(a)(2) instructs courts to "freely give leave when justice so requires," leave to amend is properly denied where the proposed amendment would be futile—that is, where the amended complaint could not survive a Rule 12(b)(6) motion to dismiss. *Rose*, 203 F.3d at 421.

The proposed amendment is futile. True, the proposed John Doe defendants are jail staff rather than supervisors, so the personal-involvement deficiency that doomed the claims against Baldwin and Lutz does not automatically apply to them in the same way. But that does not save the amended complaint, because the more

fundamental problem—the failure to plausibly allege any constitutional violation—applies with equal force regardless of who is named as a defendant. As the Court explained above, the conditions Whiteside describes at Franklin County Jail do not satisfy the objective prong of a conditions-of-confinement claim, and most of the conditions at Muskingum County Jail fail as well.

The only allegation that plausibly approaches the objective threshold—the contaminated water—still fails the subjective prong, because Whiteside does not allege that any defendant, named or unnamed, knew the water was contaminated before he was hospitalized. (*See* Doc. 11-1, #138). Adding Doe defendants who "w[ere] reported to" about these conditions does not supply the missing facts connecting any individual's deliberate and reckless response to a known serious risk. (*Id.*).

The *Monell* deficiency is equally straightforward. As those remain claims functionally against the municipalities, adding defendants with no new substantive allegations does not change the analysis.

Finally, the § 1985 conspiracy claim remains wholly conclusory. The proposed amended complaint adds no facts suggesting a plan, a shared objective, or any overt act in furtherance of an agreement—the three things a plaintiff must allege to state a conspiracy claim. *Jackson*, 925 F.3d at 817. Because the proposed amended complaint suffers from the same constitutional defects as the original and could not survive a motion to dismiss, amendment would be futile.[9] Whiteside's Motion for Leave to Amend (Doc. 11) is **DENIED**.

---

[9] Defendants' joint response to the motion to amend argues another ground for denial—the case should be dismissed because the Franklin County Ohio court of common pleas declared

## CONCLUSION

For those reasons, the Court **GRANTS** Sheriff Dallas Baldwin and Sheriff Matt Lutz's motions to dismiss. (Docs. 3, 4). But Whiteside potentially could cure the defects through new allegations, and he specifically requests an opportunity to amend in his opposition to the motion to dismiss, (*see* Doc. 8, #103), so the Court **DISMISSES** this matter **WITHOUT PREJUDICE**. That said, Minister Norman V. Whiteside's currently pending Motion to Amend Complaint (Doc. 11), which he filed without the benefit of the Court identifying the shortcomings set forth above, would be futile, so the Court **DENIES** it. Accordingly, the Court grants Whiteside twenty-one days in which to file a motion for leave to file an amended complaint, attaching the proposed amended complaint. Should he fail to do so, the Court will **DIRECT** the Clerk to enter judgment and **TERMINATE** this case on its docket.

**SO ORDERED.**

August 3, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

Whiteside a vexatious litigator, and he remains on the Ohio Supreme Court's list of vexatious litigants. (Doc. 12, #143–45). The Court resolves on separate grounds, but notes that typically, a state vexatious litigator designation does not apply in federal court. And unfortunately for Defendants, they removed this case to federal court.